IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRCT OF OHIO
EASTERN DIVISION

BRANDI CANTU,                                    )
                                                 )      CASE NO.  3:20-CV-00819-JDG
                                                 )
                  Plaintiff,                     )
                                                 )
            vs.                                  )      MAGISTRATE JUDGE
                                                 )      JONATHAN D. GREENBERG
COMMISSIONER OF SOCIAL SECURITY                  )
ADMINISTRATION,                                  )      **MEMORANDUM OF OPINION AND**
                                                 )      **ORDER**
                  Defendant.                     )
                                                 )

Plaintiff, Brandi Cantu ("Plaintiff" or "Cantu"), challenges the final decision of Defendant, Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying her applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I.     PROCEDURAL HISTORY

In May 2017, Cantu filed an application for POD, DIB, and SSI, alleging a disability onset date of October 31, 2017 and claiming she was disabled due to PTSD, fibromyalgia, degenerative disc disease, depression, and arthritis.  (Transcript ("Tr.") at 202, 283, 299.)  The applications were denied initially and upon reconsideration, and Cantu requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 202.)

On February 14, 2019, an ALJ held a hearing, during which Cantu, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On March 13, 2019, the ALJ issued a written decision

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

1

finding Plaintiff was not disabled.  (*Id.* at 202-15.)  The ALJ' s decision became final on March 23, 2020, when the Appeals Council declined further review.  (*Id.* at 1-7.)

On April 16, 2020, Cantu filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 19, 21.)  Cantu asserts the following assignments of error:

> (1)  The decision erred when it did not incorporate the claimant's need for an ambulatory device into her assigned residual functional capacity.
>
> (2)  The decision erred when it failed to consider whether the claimant met SSA Listing 1.00B.

(Doc. No. 19.)

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Cantu was born in August 1977 and was 41 years-old at the time of her administrative hearing (Tr. 213, 229), making her a "younger" person under Social Security regulations.  *See* 20 C.F.R. §§ 404.1563(c), 416.963(c).  She has a limited education and is able to communicate in English.  (Tr. 213.) She has past relevant work as a waitress, state-tested nurse assistance (STNA)/home health aide, babysitter, and activity coordinator/recreation aide.  (*Id.*)

### B.  Relevant Medical Evidence[2]

The record reflects Cantu has complained of back pain since 2016.  (Tr. 618.)  A January 23, 2017 lumbar MRI revealed degenerative changes in the facet joints bilaterally at L5-S1, resulting in mild

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  As Cantu challenges only the ALJ's physical RFC findings, the Court's discussion of the evidence is limited to Cantu's physical impairments.  (Doc. No. 19.)  In addition, the Court shall not consider any of the medical records cited in Cantu's brief that was not before the ALJ but was presented to the Appeals Council.  *See Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001) ("[E]vidence submitted to the Appeals Council after the ALJ's decision cannot be considered part of the record for purposes of substantial evidence review.")

narrowing of the spinal canal and mild narrowing of the neural foramina bilaterally.  (*Id.* at 1166.)  On March 13, 2017, Cantu underwent an L4-S1 posterior instrumented spinal fusion.  (*Id.* at 803.)

On June 12, 2017, Cantu went to the emergency room complaining of back pain.  (*Id.* at 918.) Tamara Gorniak, CNP, noted this was the third time Cantu had come to the ER for the same complaint. (*Id.*)  Cantu asked for pain control and reported she would be seeing pain management in the next few weeks.  (*Id.*)  Cantu described her pain as aching, mild, same all the time, intermittent, waxing and waning, and with a gradual onset.  (*Id.*)  Muscle relaxants and narcotics relieved the pain, while walking, bending, movement, standing, and twisting exacerbated it.  (*Id.*)  Cantu reported no bladder or bowel incontinence.  (*Id.*)  On examination, Gorniak noted Cantu had back pain but no gait problem.  (*Id.* at 919.)  Gorniak found normal range of motion and pain in the lower back.  (*Id.* at 920.)  Gorniak diagnosed chronic midline back pain with sciatica.  (*Id.*)

On August 1, 2017, Cantu saw Amy Sutton, NP, complaining of "significant pain" and reporting she had "been to the emergency room on an almost daily basis for three weeks."  (*Id.* at 803.)  Cantu told Sutton she had not been able to work.  (*Id.*)  Cantu reported the back pain she had been having before the surgery had improved, but now she had a different pain in her back and numbness in her left lower extremity.  (*Id.*)  Cantu stated the back injections she received two weeks before did not improve her pain. (*Id.*)  Cantu also reported frequent falls.  (*Id.* at 804.)  When Sutton asked whether Cantu was using a cane or a walker for walking since she had been falling, Cantu denied the use of either one.  (*Id.*)  Sutton noted, "Upon standing from a sitting position, she appears to be in very significant pain and occasionally with walking she appears to be in significant pain; however, at other times she appears to be in no pain."  (*Id.*) On examination, Sutton found equal strength in the lower extremities bilaterally, intermittent poor effort, intact strength, and "significant point tenderness throughout her lumbosacral region to even minor

palpation." (*Id.*)  Sutton's impressions consisted of chronic pain syndrome with acute exacerbation and perceived lower extremity weakness with recent falls. (*Id.*)  Sutton further noted as follows:

> I did discuss with Brandi options at this point. She is asking for a muscle relaxer, Soma. I explained to her that we cannot do that while she is on the valium. She states that Dr. Brady only put her on the valium because of muscle spasm and it has not been helping and that she will stop the valium if we are able to give her the Soma. She is also asking for more pain medications. I did explain to her that she was unable to receive narcotics from our office as her 90-day period has expired and she was referred to pain management and did not comply with their guidelines. She does state that she has a new appointment with Dr. Bacos of ProMedica in Defiance where she will be newly receiving her pain treatment; however, she will not be able to get in there for two months. At this time I have asked her to start physical therapy to help with her ambulation and her gait to try to alleviate some of her muscle spasm in her back and improve her movements.

(*Id.*)

X-rays taken of Cantu's lumbar spine that same day showed good alignment of the L4-S1 fusion with no acute fracture or spondylolisthesis. (*Id.* at 808.)

On August 3, 2017, Cantu underwent an initial physical therapy evaluation by Lynne Prigge, PT. (*Id.* at 858-62.)  Cantu complained of pain in her lower back and legs bilaterally. (*Id.* at 858.)  Cantu described feeling like she had a ball in her back and complained of burning in her back. (*Id.*)  Cantu reported limitations in sitting, standing, transitioning from sitting to standing, squatting, walking, dressing, using stairs, and lifting. (*Id.*)  Cantu rated her pain as a 7/10 at best and 10/10 at worst. (*Id.* at 858-59.) Cantu described the pain as aching, burning, sharp, shooting, stabbing, and throbbing. (*Id.* at 859.)  Cantu told Prigge her pain interfered with her sleep and physical activity, was exacerbated by all activities, and was alleviated by nothing. (*Id.*)  Cantu rated her current pain as a 9/10. (*Id.*)  Prigge noted Cantu changed position frequently. (*Id.*)  Prigge found Cantu was independent with her gait and ambulation for 100 feet and required no assistive devices, although Cantu had an antalgic gait. (*Id.*)  On examination, Prigge found positive straight leg raises while seated and supine on the left and tenderness of the lumbar

4

paraspinals.  (*Id.* at 860.)  She further found Cantu guarded with all transitions and movements.  (*Id.*)  After her first therapy session, Cantu rated her pain as a 3/10.  (*Id.* at 861.)

On August 7, 2017, Cantu saw Tammy Donaldson, PTA, for her second physical therapy appointment.  (*Id.* at 863.)  Cantu reported she had a pool at home and wanted to learn what exercises to do at home in her pool.  (*Id.*)  Cantu rated her pain before the session as a 5/10.  (*Id.*)  Donaldson noted Cantu walked into the pool area with a normal gait, went up and down stairs without difficulty, and got in and out of the pool using the pool ladder.  (*Id.*)  Cantu rated her pain after her session as a 6/10.  (*Id.* at 864.)

On August 10, 2017, Cantu underwent an x-ray of her lumbar spine.  (*Id.* at 800.)  The x-ray revealed advanced degenerative disc space narrowing at L5-S1 when compared to the previous exam of April 12, 2017 and "[s]ignificant limitation of flexion and extension . . . ."  (*Id.*)

That same day, Cantu saw Donaldson for her third physical therapy appointment.  (*Id.* at 871.)  Cantu reported her back pain was a 10/10 because she had been busy all day.  (*Id.*)  Cantu asked Donaldson if it would be okay if she swept out her pool over the weekend; Donaldson responded this would not be a good idea because of the pushing and pulling.  (*Id.*)  Cantu complained of a lot of increased pain after her last visit.  (*Id.*)  Donaldson noted that while Cantu rated her pain as a 10/10, she did not appear to have that much pain.  (*Id.*)  Cantu walked into the pool area with a normal gait, went up and down stairs without difficulty, and got in and out of the pool using the pool ladder without assistance.  (*Id.*)

On August 15, 2017, Cantu saw Bridget Gustwiller, PT, for her fourth physical therapy appointment.  (*Id.* at 874-75.)  Gustwiller noted Cantu arrived in tears, reporting she continued to feel worse after her surgery and that therapy had not been helping so far.  (*Id.* at 874.)  Cantu rated her pain as

a10/10 and said she felt like there was a huge ball in her back when she tried to lay supine.  (*Id.*)  After her pool session, Cantu reported her pain had improved to a 6/10.  (*Id.* at 875.)

On August 18, 2017, Cantu failed to attend her physical therapy appointment because of a scheduling conflict.  (*Id.* at 879.)  On August 21, 2017, Cantu failed to attend her physical therapy appointment because she was ill.  (*Id.* at 880.)

On August 24, 2017, Cantu saw Heather Auxier, NP, for complaints of low back pain.  (*Id.* at 798-99.)  Cantu rated her pain as a 7-10/10 and told Auxier it was worse with transitioning, twisting, and lifting, and better with heat and cold.  (*Id.* at 798.)  Cantu denied any other associated symptoms, including loss of bladder and bowel control.  (*Id.*)  Auxier noted Cantu was currently engaged in water therapy and that Cantu was on Soma, which Cantu stated helped her pain.  (*Id.*)  Cantu told Auxier since her last appointment she had received bilateral SI injections which did not significantly reduce her pain.  (*Id.*)  On examination, Auxier found palpatory tenderness over the lumbosacral region and a diffuse pain pattern throughout the lumbosacral spine.  (*Id.*)  Auxier noted Cantu stated she had give-way in her lower extremities and had been falling recently.  (*Id.*)  Auxier found poor motor effort in the lower extremities.  (*Id.*)  Auxier further found intact coordination, antalgic gait, and painful maneuvers with transitioning from sitting to standing.  (*Id.*)  Auxier diagnosed Cantu with post-lumbar laminectomy syndrome. (*Id.*)  Auxier noted, "At this time, it was discussed with the patient that we will not prescribe Soma, and due to the fact that she is currently utilizing and consuming Valium, she is not a candidate for tramadol."  (*Id.*)

On August 25, 2017, Cantu saw Renae Schlachter, PT, for her fifth physical therapy appointment.  (*Id.* at 884-85.)  Cantu complained of back pain that she rated a 10/10 and told Schlachter she was frustrated by a lack of answers.  (*Id.* at 884.)  Schlachter noted Cantu got in and out of the pool using the pool ladder.  (*Id.*)  Cantu reported "minimal increased pain with hip extension in the pool."  (*Id.*)

On August 28, 2017, Cantu failed to attend her physical therapy appointment because she was ill. (*Id.* at 886.)

On August 30, 2017, Cantu failed to attend her physical therapy appointment because of childcare/work coverage difficulties.  (*Id.* at 887.)  That same day, however, she saw Warren Morris, M.D., stating she was trying to get disability since she was worse after her back surgery and wanted to take Soma since that was the only thing that helped her back pain.  (*Id.* at 791.)  Dr. Morris noted Dr. Canavati gave Cantu a short course of Soma and referred Cantu to primary care for ongoing treatment. (*Id.*)  Dr. Morris found OARRS appropriate for Cantu's history and course.  (*Id.*)  On examination, Dr. Morris found normal range of cervical motion, "substantial spasm of the paraspinal musculature bilaterally" at the surgical site, and "significantly decrease[d] forward flexion," but no radiation into the legs and no disturbance of bladder function.  (*Id.* at 793.)

On September 5, 2017, Cantu failed to appear for her physical therapy appointment.  (*Id.* at 888.) Cantu called to report she overslept and missed her appointment.  (*Id.* at 889.)

On September 6, 2017, Cantu saw Donaldson for her sixth physical therapy appointment.  (*Id.* at 894-96.)  Cantu rated her pain as a 5/10 and told Donaldson she had taken pain medication before her appointment.  (*Id.* at 894.)  Cantu reported she felt unsteady and both legs felt like they were going to give out.  (*Id.*)  Donaldson noted Cantu got in and out of the pool using the pool ladder.  (*Id.*)  Cantu rated her pain as a 7/10 after the session.  (*Id.* at 895.)

On September 11, 2017, Cantu underwent a physical functional capacity evaluation.  (*Id.* at 2365-66.)  Cantu rated her low back pain as a 9/10.  (*Id.* at 2365.)  On examination, Jack Zach, PT, found Cantu's range of motion functional in her cervical spine and bilateral upper and lower extremities.  (*Id.*) He found Cantu's range of motion not functional in her thoracic and lumbar spine.  (*Id.*)  Zach found Cantu had functional strength in her upper extremities bilaterally, but not functional strength in her

bilateral lower extremities.  (*Id.*)  He also found Cantu not functional in forward flexion, bilateral side bending, squatting, forward reaching, heel raise, toe raise, single leg balancing, and climbing stairs.  (*Id.*) Zach noted Cantu did not use an assistive device, although she had a walker at home, and noted Cantu could only walk about 200 yards.  (*Id.*)  Zach further noted Cantu had increased low back pain, lower extremity weakness, and a sense of bowel incontinence.  (*Id.* at 2366.)  Zach opined Cantu could frequently lift/carry five pounds and occasionally lift/carry 10 pounds.  (*Id.*)  Zach further opined Cantu was not significantly limited in her ability to handle, but she was moderately limited in her ability to reach and extremely limited in her abilities to push/pull, bend, and perform repetitive foot movements.  (*Id.*) Zach noted Cantu reported she had fallen six times since January, could not put on her own shoes, and had lost bowel control.  (*Id.*)

On September 18, 2017, Cantu appeared for another physical therapy appointment.  (*Id.* at 2034-35.)  Therapy restrictions included no pushing, no pulling, no lifting over 30 pounds, and no mowing.  (*Id.* at 2034.)  Cantu rated her current back pain as a 4/10 and reported she felt better than last week, had been trying to walk more, and was hoping to get more of a "sit down" job with her current employer.  (*Id.* at 2035.)  Cantu got in and out of the pool without difficulty using the pool ladder.  (*Id.*)  After therapy, Cantu rated her back pain as a 6/10.  (*Id.* at 2036.)

On September 27, 2017, Cantu saw Dr. Morris for follow up of her back pain.  (*Id.* at 1037.) Cantu reported the Soma helped her back pain "a great deal" but she had run out nine days earlier.  (*Id.*) Cantu also needed a short prescription form completed for a new job.  (*Id.*)  On examination, Dr. Morris found normal cervical range of motion, "much greater lumbar flexion," continued tenderness to percussion at L3, L4, and L5, although "less than last exam," no radiation into either leg, and no bladder control issues.  (*Id.* at 1039.)

On October 17, 2017, Cantu went to the emergency room complaining of bilateral low back pain. (*Id.* at 1120.)  Cantu complained of numbness and tingling around her surgical incision as well as her buttocks bilaterally for the past two weeks.  (*Id.*)  Cantu reported the pain had worsened that day over the right buttocks and down to the sacral region.  (*Id.*)  Cantu told Christopher Mohler, M.D., that she had vomited twice and that she gets nauseous and vomits when in pain.  (*Id.*)  Cantu stated she had taken her usual medications with no relief.  (*Id.*)  Cantu described the pain as aching, moderate, intermittent, waxing and waning, and with a gradual onset.  (*Id.*)  Cantu told Dr. Mohler nothing relieved the pain, while walking and bending exacerbated it.  (*Id.*)  On examination, Dr. Mohler found normal range of motion, normal reflexes, normal muscle tone, normal coordination, "[r]eproducible tenderness over the right SI joint extending toward the right sacrum," no erythema, warmth, or drainage over the sacrum, mild tenderness over the sacrum, no tenderness in the upper thoracic and lumbar regions, and no CVA tenderness.  (*Id.* at 1122.)

On October 20, 2017, Cantu appeared for a physical therapy appointment.  (*Id.* at 2029.)  PT Prigge noted Cantu had been receiving physical therapy with aquatic therapy, but her compliance was poor.  (*Id.*)  Cantu reported she had since changed jobs and applied for disability.  (*Id.*)  Cantu told Prigge the only relief she got from her low back pain was when laying down.  (*Id.*)  Cantu rated her low back pain as a 6-7/10 at best and a 10/10 at worst.  (*Id.* at 2030.)  Cantu described the pain as "being on fire" and burning.  (*Id.*)  Cantu reported she had gone to the ER a few days before and received pain medication and prednisone.  (*Id.*)  Cantu rated her current back pain as a 7/10.  (*Id.*)  Prigge noted that after eight appointments, Cantu had made minimal gains and she had missed appointments because of illness and scheduling conflicts.  (*Id.* at 2032.)

On October 23, 2017, Cantu saw PT Schlachter for a physical therapy appointment.  (*Id.* at 2025-28.)  Cantu rated her back pain before the session as a 7/10 and reported she occasionally felt burning pain

9

in her back.  (*Id.* at 2026.)  Schlachter noted Cantu walked into the pool room slowly but got in and out of the pool without difficulty using the pool ladder.  (*Id.*)  After therapy, Cantu rated her back pain as a 7/10. (*Id.* at 2027.)

On October 30, 2017, Cantu went to the emergency room complaining of right-sided foot pain after slipping and falling off her porch about fifteen minutes earlier.  (*Id.* at 1334.)  Cantu rated her pain as a 10/10.  (*Id.*)  Jay Taylor, M.D., noted that as he entered the room Cantu was lying on the exam table in no distress, using her phone; however, once she realized he was in the room, she suddenly began crying and complaining of severe pain.  (*Id.* at 1336.)  On examination, Dr. Taylor found normal range of motion, edema, and tenderness.  (*Id.*)  Dr. Taylor noted Cantu had swelling and tenderness over the base of the fifth metatarsal of her right foot, but there was no other bony tenderness in the foot or ankle.  (*Id.*)  Dr. Taylor ordered an x-ray, which revealed a fracture of the base of the fifth metatarsal.  (*Id.*)  Dr. Taylor put Cantu in a long-leg posterior splint and gave her crutches and an orthopedic referral.  (*Id.*)  Dr. Taylor noted: "OARRS report does show multiple narcotics over her current morphine equivalent score is 0 in this is a new acute problem requiring pain medication.  She has been given a narcotic warning."  (*Id.*)

In November 2017, Cantu underwent surgery on her right foot.  (*Id.* at 2290.)

On November 15, 2017, Cantu's treating physician, Dr. Sharrock-Dorsten, completed a Medical Source Statement regarding Cantu's physical capacity.  (*Id.* at 1204-05.)  Dr. Sharrock-Dorsten opined Cantu's lifting and carrying was impacted by her fractured foot but offered no opinion as to how much Cantu could occasionally and frequently lift and/or carry.  (*Id.* at 1204.)  Dr. Sharrock-Dorsten further opined Cantu's ability to stand and/or walk was impacted by her fractured foot but again offered no opinion as to how long Cantu could stand and/or walk.  (*Id.*)  While Cantu could sit for a total of 6-8 hours and 1-2 hours without interruption, Dr. Sharrock-Dorsten opined Cantu needed to elevate her foot.  (*Id.*) Because of her fractured foot, Dr. Sharrock-Dorsten further opined Cantu could never climb, balance,

10

stoop, crouch, kneel, or crawl.  (*Id.*)  Cantu could use her hands "as long as sitting," and could occasionally reach, push/pull, and perform fine and gross manipulation.  (*Id.* at 1205.)  Dr. Sharrock-Dorsten noted a rollabout walker had been prescribed, and that Cantu needed to alternate positions at will. (*Id.*)  Dr. Sharrock-Dorsten opined Cantu experienced severe pain that interfered with her concentration, would take her off-task, and cause absenteeism.  (*Id.*)  Cantu needed to elevate her legs at will to 90 and 120 degrees, and would need extra unscheduled work breaks, although Dr. Sharrock-Dorsten did not opine as to how much additional rest time Cantu would require.  (*Id.*)

On November 17, 2017, Cantu saw Dr. Sharrock-Dorsten for a post-operative visit after her foot surgery.  (*Id.* at 2001.)  Cantu reported her pain level was decreasing but she was still taking Norco every 6-8 hours.  (*Id.*)  Cantu told Dr. Sharrock-Dorsten she fell the night before while she had her splint on her foot.  (*Id.*)  On examination, Dr. Sharrock-Dorsten found edema and pain to palpation.  (*Id.*)

An x-ray taken that same day of Cantu's right foot showed a bone staple traversing a fifth metatarsal base fracture, mild first MTP osteoarthritis, moderate calcaneoboid osteoarthritis, and mild fourth and fifth TMT osteoarthritis.  (*Id.* at 2009.)

On December 1, 2017, Jodi Arnold, PT, noted:

> Pt referred to PT for gait training with a walker partial weightbearing R LE due to a fracture at R foot. Pt wearing a camwalker to the R LE. Instructed pt on PWB gait with standard walker per pt preference. Pt dem I with safe and proper sequencing using the walker. No further PT needed at this time.

(*Id.* at 2003.)

On February 14, 2018, Cantu underwent an initial evaluation for physical therapy for left lower leg weakness and low back pain.  (*Id.* at 2252.)  Cantu reported she had just been starting to see a benefit for her previous aquatic physical therapy when she injured her right foot and had to stop.  (*Id.* at 2252.)  Cantu stated she had received injections in her low back in June and July 2017, which did not help her pain.  (*Id.*)

11

PT Schlachter noted Cantu was in a cast boot and was non-weight bearing for three months after injuring her foot and ankle.  (*Id.*)

On February 21, 2018, Cantu went to the emergency room complaining of right foot pain that started about two days earlier.  (*Id.* at 2290.)  Cantu told Erica Pribis, M.D., that she had an appointment with her doctor coming up.  (*Id.*)  Cantu complained of ongoing pain issues after her foot surgery, for which she typically took Tramadol, but she was out.  (*Id.*)  Cantu reported twisting her foot the other day while walking, which caused swelling and increased pain.  (*Id.*)  Cantu told Dr. Pribis she was not supposed to be in any kind of brace or support.  (*Id.*)  On examination, Dr. Pribis found pain and mild swelling in the right foot, along with a well-healed incision and no redness or bruising.  (*Id.* at 2291.)  Cantu moved all extremities equally.  (*Id.*)  Dr. Pribis noted Cantu requested more Tramadol, but she explained the restrictions on prescribing and an x-ray taken that day showed no acute process.  (*Id.* at 2292.)

On March 13, 2018, Cantu appeared for a physical therapy appointment.  (*Id.* at 2257.)  Cantu rated her low back pain as a 0/10 and right foot pain as a 5/10.  (*Id.*)  Cantu reported she thought she had overdone it during her last physical therapy appointment, as she had increased right foot pain after doing step-ups in the pool.  (*Id.*)  Cantu stated she could not focus on her back because of her right foot pain.  (*Id.*)  Cantu got in and out of the pool without difficulty using the pool ladder.  (*Id.*)  After therapy, Cantu reported no increased low back pain, although it was noted her right foot pain was limiting progression of exercises in the pool.  (*Id.* at 2258.)

On March 20, 2018, Cantu saw PT Schlachter for a physical therapy appointment.  (*Id.* at 2253-56.)  Although Cantu rated her low back pain as a 6/10, she got in and out of the pool using the pool ladder without difficulty.  (*Id.* at 2253.)  Cantu complained of right foot pain continuing to limit her activities.  (*Id.*)  After therapy, Cantu rated her low back pain as a 5/10.  (*Id*. at 2254.)  Schlachter rated

Cantu's bilateral lower extremity strength as a 4+ to 5/5, except for right ankle dorsiflexion and eversion, which was a 4/5.  (*Id.* at 2256.)

On March 27, 2018, Cantu appeared for another physical therapy session.  (*Id.* at 2200.)  Cantu rated her back pain as a 3/10 since last session.  (*Id.*)  Cantu got in and out of the pool using the pool ladder without difficulty.  (*Id.* at 2201.)  PT Schlachter noted Cantu tolerated the session well with no increased back pain after the session.  (*Id.* at 2202.)

On April 13, 2018, Cantu saw Dr. Sharrock-Dorsten for follow up regarding her right foot pain.  (*Id.* at 2378.)  Cantu complained of pain at the incision line, saying she was in a lot of pain and could not put any pressure on it.  (*Id.*)  Cantu told Dr. Sharrock-Dorsten she had been taking ibuprofen, but it was making her sick.  (*Id.*)  Cantu described the pain as burning and reported that certain shoe gear rubbed along the incision line.  (*Id.*)  On examination, Dr. Sharrock-Dorsten found abnormal tactile sharp and dull touch, normal skin color and pigmentation, and pain to palpation over the hardware and incision area.  (*Id.*)  Dr. Sharrock-Dorsten diagnosed Cantu with neuritis, closed fracture of the right foot with nonunion, and painful orthopaedic hardware.  (*Id.*)  Dr. Sharrock-Dorsten ordered a three-phase bone scan of the right foot, and after obtaining the results would discuss options with Cantu.  (*Id.*)  Dr. Sharrock-Dorsten noted they may consider a bone stimulator or removing the hardware.  (*Id.*)

On April 17, 2018, Cantu saw PT Schlachter for a physical therapy appointment.  (*Id.* at 2187-89.)  Cantu rated her back pain as a 7/10.  (*Id.* at 2187.)  Cantu reported she had seen her doctor last week and planned to have her hardware removed soon.  (*Id.*)  Cantu told Schlachter her foot pain was limiting her activity and she thought how she walks and stands because of the pain in her foot may be causing increased back pain.  (*Id.*)  Schlachter noted Cantu got in and out of the pool using the pool ladder.  (*Id.* at 2188.)  After the session, Cantu reported "no increased low back pain after PT not rating on 0-10 scale."  (*Id.* at 2189.)

13

On April 30, 2018, Cantu saw Schlachter for another physical therapy appointment. (*Id.* at 2184-86.) Cantu rated her back pain as a 10/10. (*Id.* at 2184.) Cantu told Schlachter she had danced and started to open her pool over the weekend with increased pain. (*Id.*) Schlachter noted Cantu walked with a "slow antalgic gait" into the pool room. (*Id.* at 2185.) Cantu rated her pain as an 8/10 after the session. (*Id.* at 2186.)

On June 1, 2018, Cantu underwent an MRI of her lumbar spine, which revealed prior posterior fusion at L4-S1, no fracture or misalignment, no spinal canal stenosis, and degenerative disc disease with spondylosis at L5-S1. (*Id.* at 2367-68.)

On July 25, 2018, Cantu saw Ashok Biyani, M.D., for complaints of low back pain and falls. (*Id.* at 2214-15.) Cantu reported her pain got somewhat better after her March 2017 surgery, but she continued to have numbness in her right lower extremity as well as significant pain in her back. (*Id.* at 2214.) Cantu rated her pain as a 10/10 at its worst and a 9/10 at best. (*Id.*) Cantu complained that the pain seemed to be getting worse and nothing made it better. (*Id.*) Cantu told Dr. Biyani she was on Soma and Valium for the pain. (*Id.*) Cantu reported her legs were weak and sometimes her left leg would give out and she would fall. (*Id.*) Cantu told Dr. Biyani she fell about six times a week. (*Id.*) Cantu denied bowel or bladder dysfunction. (*Id.*) On examination, Dr. Biyani found normal appearance of the upper and lower extremities, painless and normal joint movements of the upper and lower extremities with no signs of instability, "a very antalgic gait," inability to tandem line gait, tenderness to palpation throughout the lumbar spine with paraspinal spasm, slightly limited range of motion of the back, more pain with back extension than flexion, normal strength in the lower extremities, slightly decreased sensation in the left thigh, and negative Hoffman's sign. (*Id.*) Dr. Biyani ordered a CT of the lumbar spine. (*Id.* at 2215.)

On September 26, 2018, Cantu underwent an EMG study. (*Id.* at 2323-2324.) The EMG testing revealed evidence of: predominantly sensory peripheral polyneuropathy involving both lower extremities;

mild right tibial mononeuropathy; moderate-to-severe left peroneal mononeuropathy at the fibular head on the left side; mild-to-moderate left tibial mononeuropathy at the knee; and nonrecordable F and H responses suggestive of involvement of L4-5 and L5-S1 myotomes. (*Id.* at 2324.)

On October 5, 2018, Cantu went to the emergency room after seeing her primary care physician an hour before. (*Id.* at 2358.) Cantu complained of back spasms and chronic back pain. (*Id.*) Cantu reported she had an upcoming appointment with a new neurologist the following Wednesday and had an appointment with a new pain management center later that month. (*Id.*) Cantu stated the only thing that helped her pain was Soma. (*Id.*) On examination, Mary Beth Crawford, M.D., found normal range of motion, no edema or tenderness, normal muscle tone, normal coordination, an ability to lift both legs off the bed, intact motor functioning, and 5/5 strength of the bilateral lower extremities despite radiating pain and paresthesias bilaterally. (*Id.* at 2360-61.) Dr. Crawford thought it was reasonable to give Cantu enough Soma to get her through to her Wednesday appointment. (*Id.* at 2361.)

On November 28, 2018, Cantu saw Khalid Mahmood, M.D., for her mononeuropathy. (*Id.* at 2394.) Cantu reported chronic low back pain that radiated to both thighs and down her legs into her feet since her back surgery in 2017. (*Id.*) Cantu denied significant bladder dysfunction, although she complained of frequent urination. (*Id.*) Cantu reported the pain medications she had been taking had not been helping much and her symptoms were constant. (*Id.*) Cantu denied difficulty walking or any problems with her upper extremities. (*Id.*) On examination, Dr. Mahmood found no musculoskeletal tenderness or swelling, normal muscle bulk, tone, and strength, normal coordination from finger-to-nose and heel-to-shin, normal gait, and negative Romberg's. (*Id.* at 2396.) Cantu's diagnoses included neuropathy and numbness and tingling. (*Id.*) Dr. Mahmood deferred further treatment to Cantu's family physician. (*Id.*)

On January 28, 2019, Dr. Sharrock-Dorsten noted Cantu was tentatively scheduled to have foot surgery on February 28, 2019.  (*Id.* at 2471.)

## C.    State Agency Reports

On October 4, 2017, Diane Manos, M.D., opined that Cantu could occasionally lift and/or carry 10 pounds and frequently lift and/or carry less than 10 pounds.  (*Id.* at 292, 308.)  Cantu could stand and/or walk for four hours and sit for about six hours in an eight-hour workday.  (*Id.*)  Cantu could occasionally push and/or pull with the bilateral lower extremities.  (*Id.*)  Dr. Manos further opined Cantu could occasionally climb ramps/stairs but could never climb ladders, ropes, or scaffolds.  (*Id.* at 293, 308.)  Cantu could occasionally balance, stoop, kneel, crouch, and crawl.  (*Id.* at 293, 309.)  Dr. Manos found Cantu's ability to reach overhead bilaterally was limited.  (*Id.*)  Dr. Manos further opined Cantu must avoid all exposure to hazards.  (*Id.* at 294, 310.)

On January 5, 2018, on reconsideration, Gerald Kylop, M.D., affirmed Dr. Manos's findings.  (*Id.* at 329-31, 349-51.)

## D.    Hearing Testimony

During the February 14, 2019 hearing, Cantu testified to the following:

- She has a driver's license, but has problems driving.  (*Id.* at 230.)  She had a panic attack and got into a car accident about a month before, and her doctor advised her that it was probably best she not drive while taking the medication she is on for her anxiety.  (*Id.*)  Her daughter had to get her driver's license.  (*Id.*)

- She last worked as a secretary for Community Health Professionals, Inc.  (*Id.*)  She worked part-time.  (*Id.*)  In October 2017 she fell and broke her foot and needed to have surgery.  (*Id.* at 231.)  She went back to work for two weeks before she was fired because they could not accommodate the walker she had to use.  (*Id.*)

- She cannot work because of her anxiety and PTSD.  (*Id.*)  She has bad panic attacks and she just ends up in a corner crying.  (*Id.*)  She feels locked in rooms.  (*Id.*)  She gets nervous around people and forgets what she was doing.  (*Id.*)  When she was working at Bob Evans, she got written up a lot for having meltdowns.  (*Id.* at 232.)

- She could walk from her couch to her kitchen sink.  (*Id.*)  She can stand for about 10 minutes before she had to sit back down, and then she has to get back up because her

16

back hurts.  (*Id.*)  Her neuropathy causes bowel incontinence and frequent falls.  (*Id.*)
She is only supposed to lift five pounds according to her doctor.  (*Id.*)  She can wash
dishes, wipe down counters, and other chores where she can hold onto the edge of
something.  (*Id.* at 234.)  Ninety percent of the housework falls on her daughters.  (*Id.*
at 242.)

- She goes to bed at 8:30 p.m. but only gets four to six hours of sleep a night.  (*Id.* at
233.)  She typically naps for 30-40 minutes to get pressure off her back during the
day.  (*Id.*)  Sometimes she sleeps for 24 hours because she cannot get out of bed to
walk.  (*Id.*)

- She was using a walker at the hearing.  (*Id.* at 234.)  She uses the walker all the time.
(*Id.* at 235.)  She also has a cane.  (*Id.*)  She uses the cane when it is dry outside.  (*Id.*)
It is easier to use the cane for getting in and out of the car when there is no
precipitation or ice.  (*Id.*)

- Her neuropathy causes no feeling in the back of her legs, which causes her to fall.
(*Id.*)  The last time she fell was the day before the hearing.  (*Id.*)  She fell on ice in the
parking lot outside her doctor's office.  (*Id.* at 235-36.)  She falls anywhere from
three to four times a day because her legs give out.  (*Id.* at 236.)  She falls even with
her hands on her walker.  (*Id.*)

- Her back surgery made her symptoms worse.  (*Id.*)   Her foot still causes her pain,
and she was scheduled for another surgery at the end of the month.  (*Id.* at 245.)  Her
foot is part of her walking problem because it hurst so much.  (*Id.*)

- She goes to church weekly.  (*Id.* at 238.)  She goes to bible study on Tuesday nights,
prayer service on Wednesday nights, and church service on Sundays.  (*Id.* at 238-39.)
Sunday services last an hour and a half.  (*Id.* at 239.)  She is not able to sit through
the entire sermon.  (*Id.*)  She gets up, makes coffee, and serves coffee and water to
people.  (*Id.*)  It is something she can walk up and down and do.  (*Id.*)  She cannot sit
through the 45-minute prayer services.  (*Id.*)  They know her condition, so she is able
to get up and get a coffee and then come back.  (*Id.*)  She cannot attend her
daughter's basketball games because she cannot sit in the bleachers.  (*Id.*)  Her
mother visits her twice a week.  (*Id.* at 244.)  She does not date.  (*Id.*)  She does not
go to the movies because she cannot sit through a movie.  (*Id.*)  Her driving is limited
because of her legs.  (*Id.*)  She reads a lot and has bible study at her house but does
not get out in the community much.  (*Id.*)

The VE testified Cantu had past work as a waitress, state-testing nursing assistant, babysitter, and

activity coordinator.  (*Id.* at 246.)  The ALJ then posed the following hypothetical question:

> First hypothetical, assume that a hypothetical individual of the claimant's age,
> education, and work experience has the residual functional capacity for work at
> the sedentary exertional level, postural limitations of no climbing of ladders,
> ropes, or scaffolds; occasional climbing of ramps and stairs; occasional stooping,

17

kneeling, crouching; no crawling; occasional use of the bilateral lower extremities for operation of foot controls; manipulative limitation of no use of the bilateral upper extremities for overhead reaching; frequent use of the bilateral upper extremities for other reaching, handling, and fingering.

Environmental limitation to avoid all exposure to hazards such as dangerous moving machinery and unprotected heights; additional environmental limitation to avoid concentrated exposure to irritants such as fumes, odors, dust, and gases. Work limited to simple, routine, and repetitive tasks in a work environment free from fast-paced production requirements such as moving assembly lines and conveyor belts, involving only work-related decisions with few, if any, workplace changes; no interaction with the general public; occasional interaction with coworkers and supervisors.

Ms. Davies, would a hypothetical individual with that residual functional capacity be able to perform any of the identified past relevant work jobs?

(*Id.* at 247-48.)

The VE testified the hypothetical individual would not be able to perform Cantu's past work as a waitress, state-testing nursing assistant, babysitter, and activity coordinator.  (*Id.* at 248.)  The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as textile stuffer, laminator I, and optical goods final assembler.  (*Id.*)

The ALJ modified the hypothetical to add a sit-stand option, under which the hypothetical individual would be allowed to sit or stand, alternating positions for one or two minutes in the immediate vicinity of the workstation, no more frequently than every 30 minutes.  (*Id.* at 249.)  The VE testified that in her experience, she would cut the numbers of available jobs in half based on the availability of accommodating employers.  (*Id.*)

The ALJ further modified the hypothetical to change the bilateral upper extremities for pushing and pulling to occasional.  (*Id.*)  The VE took out the textile stuffer job and replaced it with hand mounter.  (*Id.*)

Counsel for Cantu asked the VE whether adding that a person needed to use a four-legged walker when standing or walking would change the identified jobs.  (*Id.* at 252-53.)  The VE testified that it

would not.  (*Id.* at 253.)  When asked whether it would change the numbers, the VE testified that it could based on "kind of a subjective view of an employer."  (*Id.*)  The VE testified that she would deduct a third of the numbers based on her experience.  (*Id.* at 254.)

### III.  STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b), 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c), 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful

activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Cantu was insured on her alleged disability onset date, October 31, 2017, and remained insured through March 31, 2020, her date last insured ("DLI"). (Tr. 202-03.) Therefore, in order to be entitled to POD and DIB, Cantu must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through March 31, 2020.

2.   The claimant has not engaged in substantial gainful activity since October 31, 2017, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.   The claimant has the following severe impairments: cervical and lumbar degenerative disc disease/post-laminectomy syndrome, obesity, multiple mononeuropathies and sensory neuropathy, and mental impairments variously described as PTSD, major depressive disorder, generalized anxiety disorder, and polysubstance dependence (alcohol and cocaine) (20 CFR 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR

20

Part 404, Subpart P, Appendix I (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except: Postural limitation of no climbing of ladders, ropes, or scaffolds. Occasional climbing of ramps and stairs. Occasional stooping, kneeling, crouching. No crawling. Occasional use of the bilateral lower extremities for operation of foot controls. Manipulative limitation of no use of the bilateral upper extremities for overhead reaching. Frequent use of the bilateral upper extremities for other reaching, handling, and fingering. Environmental limitation to avoid all exposure to hazards, such as dangerous moving machinery and unprotected heights. Additional environmental limitation to avoid concentrated exposure to irritants such as fumes, odors, dust, and gases. Work limited to simple, routine, and repetitive tasks in a work environment free from fast paced production requirements, such as moving assembly lines and conveyor belts, involving only work related decisions, with few if any work place changes. No interaction with the general public. Occasional interaction with coworkers, and supervisors.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.     The claimant was born on August **, 1977 and was 40 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.     The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from October 31, 2017, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 205-15.)

## V.    STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

22

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A. RFC Challenge

Cantu argues the ALJ erred in excluding use of a walker from her RFC, despite acknowledging that a walker had been prescribed. (Doc. No. 19 at 11.) Cantu maintains that while the ALJ determined she had not used her walker during examinations, the ALJ failed to cite any specific examination where Cantu was noted to walk or stand without the need for an assistive device. (*Id.*) In addition, Cantu argues the decision fails to utilize the correct legal standard when assessing whether to incorporate a walker into the RFC. (*Id.* at 12.)

The Commissioner responds that the ALJ explained why use of a walker was inconsistent with the "longitudinal record" and that substantial evidence supports the ALJ's RFC findings.  (Doc. No. 21 at 9.-10.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations.  *See* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.   *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence (20 C.F.R. §§ 404.1546(c), 416.946(c)) and must consider all of a claimant's medically determinable impairments, both individually and in combination.  *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."  *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  *See also* SSR 96-8p, 1996 WL 374184, at *7 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).   While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine her RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

24

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered. *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*). However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability. *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports"). *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

SSR 96–9p (which neither party cites) addresses the use of an assistive device in determining RFC and the vocational implications of such devices:

> **Medically required hand-held assistive device:** To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information). The adjudicator must always consider the

25

particular facts of a case. For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded.

SSR 96–9p, 1996 WL 374185, at *7 (S.S.A. July 2, 1996).  Interpreting this ruling, the Sixth Circuit has explained that where a cane "was not a necessary device for claimant's use, it cannot be considered an exertional limitation that reduced her ability to work." *Carreon v. Massanari*, 51 F. App'x 571, 575 (6th Cir. 2002).  While the Sixth Circuit has not directly ruled on this issue, other courts in this district have noted that, in cases involving assistive devices including a cane, documentation "describing the circumstances for which [the assistive device] is needed" is critical to establishing that it qualifies as a "necessary device" under SSR 96-9p. *McGill v. Comm'r of Soc. Sec. Admin.*, No. 5:18 CV 1636, 2019 WL 4346275, at *10 (N.D. Ohio Sept. 12, 2019), *citing Carreon v. Massanari*, 51 F. App'x at 575; *Tripp v. Astrue*, 489 F. App'x 951, 955 (7th Cir. 2012) (noting that a finding of medical necessity of an assistive device requires a statement of the circumstances in which it is needed and that other circuits "have required an unambiguous opinion from a physician stating the circumstances in which an assistive device is medically necessary"); *Spaulding v. Astrue*, 379 F. App'x 776, 780 (10th Cir. 2010) (prescription for a cane from the Veteran's Administration insufficient to show medical necessity); *Howze v. Barnhart*, 53 F. App'x 218, 222 (3d Cir. 2002) (prescription and references that claimant used a cane insufficient to show medical necessity).

The ALJ found as follows with respect to Cantu's need for a walker:

Dr. Sharrock Dorsten authored a medical source statement on November 15, 2017. (Exhibit B12F/78-79). Therein, it was opined that the claimant needed a rollabout walker and could engage in no postural activities, and that her ability to lift, carry, stand and walk [sic]. (Id.). This opinion is not persuasive, as the basis for this opinion was the claimant's fractured foot, a nonsevere impairment. (Id.) Similarly, the claimant was issued a handicap placard on October 31, 2017, just days after her foot fracture. (Id.) Same, as noted above, is not a severe impairment, as it did not have more than minimal ongoing limitations on the claimant's ability to function. (Exhibits B14F/52-58, B17F & B18F/1-145). Notably, x-rays of December 1, 2017, showed satisfactory and normal alignment

of the fracture. (Exhibit B21F/18, B24F/18). Further, in January 2018, the claimant reported decreased pain and being able to stand four to five hours before achiness started. (Exhibit B28F). Updated right foot imaging in April 2018 showed a healed fracture with no swelling or joint space narrowing. (Exhibit B46F/5). Finally, multiple examinations thereafter failed to document the use of or need for an assistive device, examinations demonstrated normal lower extremity strength and no joint instability, x-rays were noted to show L4-S1 fusion and no significant degenerative disc disease, and an MRI was noted to show patent central canal and no signs of foraminal stenosis. (see, generally, Exhibits B32F-34F, B42F, B47F-B48F).

The undersigned also acknowledges a prescription for a rolling walker in February 2017. (Exhibit B52F). This is not persuasive or considered in the claimant's residual functional capacity, as it predates the relevant period, was issued in connection with her back surgery, and as noted above, has not been observed in use in examinations during the relevant period, less those associated with the nonsevere impairment of a right foot fracture.

* * *

Moreover, the undersigned notes multiple inconsistent statements throughout the record and at the hearing. Notably, as outlined above, her reported pain levels varied throughout the record and were inconsistent with the objective findings, which showed patent central canal, no significant degenerative disc disease, and no stenosis. Additionally, she reported at the hearing she had stopped driving due to an accident secondary to a panic attack; however, she reported to Dr. Brady that this accident was the result of the vehicle in front of her "short stopping" and the claimant not being able to stop in time. (Exhibit B35F/8). Further, the claimant presented to the hearing using a walker, which she stated she used "all the time." However, as detailed above, the record does not support this allegation and, in fact, fails to demonstrate any ongoing need for or use thereof, with all relevant treating sources consistently failing to document same throughout the record and, to the contrary, documenting relatively benign physical findings on examination, such as normal lower extremity strength, bulk, and tone. These discrepancies diminish the persuasiveness of the claimant's subjective complaints and alleged functional limitations. This is not to say that the claimant was symptom free or did not experience difficulty performing some tasks. However, the objective evidence does not demonstrate the existence of limitations of such severity as to have precluded the claimant from performing all work on a regular and continuing basis at any time from the alleged onset date of disability.

(Tr. 211-13.)

Cantu points to evidence consisting of her prescription for a walker,[3] an antalgic gait, poor motor functioning, "give-way" in the lower extremities, painful transition from sitting to standing, and tenderness and decreased sensation in the lower extremities, and two treating sources opined that she had a limited capacity to walk and stand and she had been prescribed a walker to assist with those activities. (Doc. No. 19 at 12.)   However, Cantu does not identify any evidence that meets the standard articulated in SSR 96-9p, which requires documentation giving context for the need for a walker by describing the circumstances for which it is needed.  In similar situations, multiple courts throughout this Circuit upheld ALJ decisions that did not include the need for an assistive device in a claimant's RFC.  *See, e.g., Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *19 (N.D. Ohio Dec. 12, 2018) ("Moreover, as [the doctor's] confirmation of a cane prescription does not indicate 'the circumstances for which [the cane] is needed,' it does not fulfill the requirements under SSR 96-9p."); *Krieger v. Comm'r of Soc. Sec.*, No. 2:18-cv-876, 2019 WL 1146356, at *6 (S.D. Ohio March 13, 2019) (finding ALJ did not err in not including a limitation for a cane where physician indicated claimant would need a cane but did not describe the specific circumstances for which a cane was needed as required by SSR 96-9p); *Salem v. Colvin*, No. 14-CV-11616, 2015 WL 12732456, at *4 (E.D. Mich. Aug. 3, 2015) (finding the ALJ did not err in not including a limitation for a cane, when it had been prescribed, but the prescription did not "indicate the circumstances in which [the claimant] might require the use of a cane."); *Marko v. Comm'r of Soc. Sec.*, No. 2:16-cv-12204, 2017 WL 3116246, at *5 (E.D. Mich. July 21, 2017) (rejecting claimant's assertion that the ALJ failed to account for her use of a cane, stating that nothing in the physician's "mere prescription for a cane provides evidence to indicate the frequency with which the cane should be used, its purpose, or its limit upon Plaintiff's ability to perform light work" (citations omitted)).

---

[3] Cantu's prescription for a walker states, "Rolling walker for home use. Dx: Lumbar anterolisthesis, stenosis, ddd and disc protrusion. SP Lumbar fusion."  (Tr. 2472.)

Furthermore, the ALJ acknowledged evidence regarding Cantu's use of a walker and that Cantu could walk without an assistive device.  (Tr. 208-213.)  *See Forrester v. Comm'r of Soc. Sec.*, No. 2:16-cv-1156, 2017 WL 4769006, at *3 (S.D. Ohio Oct. 23, 2017) ("Unlike many cases involving the use of a cane, the ALJ did not overlook evidence concerning Plaintiff's need for the cane or fail to address this issue.") (collecting cases).  "[W]here there is conflicting evidence concerning the need for a cane, 'it is the ALJ's task, and not the Court's, to resolve conflicts in the evidence.'"  *Forrester*, 2017 WL 4769006, at *4 (citation omitted).  The same is true here.  The ALJ's decision reflects he considered the evidence regarding Cantu's use of a walker and found it not fully credible because of inconsistencies in the record.  *Cruz-Ridolfi v. Comm'r of Soc. Sec.*, Case No. 1:17 CV 1075, 2018 WL 1136119, at *16 (N.D. Ohio Feb. 12, 2018), *report and recommendation adopted by* 2018 WL 1136119 (N.D. Ohio Feb. 28, 2018).

In addition, the ALJ's reasoning regarding Cantu's need for a cane is clear from his decision.  The Court notes Cantu does not challenge the ALJ's evaluation of Dr. Sharrock-Dorsten's opinion, the finding that her fractured foot was a non-severe impairment, or the ALJ's credibility findings.

Therefore, the ALJ's decision to exclude a walker from the RFC is supported by substantial evidence, and this assignment of error is without merit.[4]  For all the reasons set forth above, the ALJ's RFC finding is AFFIRMED.

**B.      Listing Challenge**

Cantu further argues the "ALJ erred when the decision excludes an analysis of whether Ms. Cantu met the requirements of SSA Listing 1.00B."  (Doc. No. 19 at 13.)  Cantu maintains the evidence shows

---

[4] Even assuming, *arguendo*, the ALJ erred in omitting the use of a walker from the RFC, any such error is harmless as the VE testified that the need for a walker would not preclude performance of the identified representative jobs in the national economy, although it would reduce the number of available jobs by one-third.  (Tr. 253-54.)  Cantu makes no Step Five challenge that the reduced numbers fail to satisfy the Commissioner's burden.  (*See* Doc. No. 19.)

she was unable to ambulate effectively as the term is defined in Listing 1.00, and the ALJ's "failure to assess whether Ms. Cantu meets this listing is a material error." (*Id.*)

The Commissioner responds that while Cantu argues she was unable to ambulate effectively under § 1.00B, she fails to identify a specific listing and diagnostic criteria that she meets. (Doc. No. 21 at 11.) The Commissioner maintains that "[t]he inability to ambulate effectively, even if shown (which here, it was not), is only one part of the listings criteria for any listings under Section 1.00." (*Id.* at 12.)

At the third step in the disability evaluation process, a claimant will be found disabled if his impairment meets or equals one of the Listing of Impairments. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010). The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a). Essentially, a claimant who meets the requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3). It is the claimant's burden to bring forth evidence to establish that his impairments meet or are medically equivalent to a listed impairment. *See e.g. Lett v. Colvin*, No. 1:13 CV 2517, 2015 WL 853425, at *15 (N.D. Ohio Feb. 26, 2015). A claimant must satisfy all of the criteria to "meet" the listing. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). A claimant is also disabled if his impairment is the medical equivalent of a listing, 20 C.F.R. § 416.925(c)(5), which means it is "at

least equal in severity and duration to the criteria of any listed impairment."  20 C.F.R. §§ 404.1526(a), 416.926(a).

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment.  *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414-15 (6th Cir. 2011).  In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for her decision.  *Id.* at 416-17.  *See also Harvey v. Comm'r of Soc. Sec.*, No. 16-3266, 2017 WL 4216585, at \*5 (6th Cir. March 6, 2017) ("In assessing whether a claimant meets a Listing, the ALJ must 'actually evaluate the evidence,' compare it to the requirements of the relevant Listing, and provide an 'explained conclusion, in order to facilitate meaningful judicial review.'" (quoting *Reynolds*, 424 F. App'x at 416); *Joseph v. Comm'r of Soc. Sec.*, 741 F. App'x 306, 311 (6th Cir. 2018) (same).

Section § 1.00 concerns the musculoskeletal system.  Listing § 1.00B is not a specific listing; rather, it explains loss of function for Section 1.00.  20 C.F.R. Pt. 404, Subpart P, App'x 1.  As Cantu appears to admit,[5] Listing 1.00B2b contains a definition of the "inability to ambulate effectively" to determine functional loss for purposes of the listings.  *Id.*  However, even if Cantu meets the definition of "inability to ambulate effectively," Cantu makes no argument that she meets or equals any of the specific listings set forth in Section 1.00, and the Court shall not develop such arguments for her.

## VII.   CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

---

[5] Cantu argues, "The medical evidence supports a finding that Mr. [sic] Cantu has been unable to ambulate effectively, as the term is defined in Listing 1.00, subsequent to her spinal fusion (Appendix 1 to Subpart P of Part 404-Listing of Impairments)."  (Doc. No. 19 at 13.)

Date: May 27, 2021

                                              *s/ Jonathan Greenberg*
                                            Jonathan D. Greenberg
                                            United States Magistrate Judge